[Docket No. 50.]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Crim. No. 22-361 (RMB) |
| MARVIN MURPHY, | **OPINION** |
| Defendant. | |

**RENÉE MARIE BUMB, Chief United States District Judge**

In this drug-trafficking prosecution, Defendant Marvin Murphy asks this Court to suppress his warrantless arrest and the warrantless seizures of his cellphones and a bag full of cash. He argues law enforcement lacked probable cause to arrest him, and none of the exceptions to the warrant requirement allowed the warrantless searches and seizures, and therefore, this Court should suppress that evidence. He also asks this Court to suppress evidence obtained from search warrants authorizing law enforcement to search his cellphones. He contends those warrants are invalid because they are overbroad and not particularized. Murphy also argues law enforcement's three-week delay in obtaining the warrants was unreasonable, and so, the Court should suppress all evidence obtained from them. Besides his suppression requests, Murphy asks this Court to order the Government to provide him with a slew of information, ranging from coconspirator statements to prior bad act evidence to all *Giglio*, *Brady*, and Jencks materials.

For the below reasons, the Court **DENIES** Murphy's entire suppression motion, and **DENIES WITHOUT PREJUDICE** the other aspects of his omnibus motion seeking discovery.

## I. BACKGROUND

### A. The Tip and the Meeting

In May 2021, United States Department of Homeland Security agents learned from a confidential source (the Source) that an "individual from the East Coast[,]" Carl Lee Holloway, wanted to buy cocaine.  [Hr'g Tr. 9:1 to 6.]  The Source invited Holloway to California to meet a potential cocaine supplier.  [*Id.* at 9:10 to 12.]  Holloway agreed.  [*Id.*] About a month later, the Source and Homeland agent Mitchell Martinez, posing as a drug dealer from the United States, met with Holloway in California, and the trio traveled to a restaurant to discuss a potential drug deal.  [*Id.* at 9:10 to 18; 40:4 to 11.]

At the restaurant, the trio "discussed pricing for the cocaine and how we were going to get the cocaine from San Diego to the East Coast."  [*Id.* at 10:1 to 4.]  "Holloway and his friends were going to buy the cocaine."  [*Id.* at 10:5 to 7.]  At one point, another Homeland undercover agent drove to the restaurant with a kilogram of cocaine to show Holloway.[1]  [*Id.* at 10:21 to 11:3.]  Martinez and Holloway then went to the other undercover's car where Holloway opened the drug packaging so he could see the cocaine.  [*Id.* at 11:6 to 12.] Martinez called this procedure a "show-and-tell" where a potential buyer of cocaine inspects the drug, may smell it or "look at the scales of the [drug]" to "make sure it's not too dry." [*Id.*]  Holloway "seemed satisfied" with the cocaine.  [*Id.* at 11:13 to 15.]

After the show-and-tell, Martinez and Holloway went back into restaurant to talk pricing.  [*Id.* at 11:15 to 17.]  Holloway agreed to pay $23,500 per kilo, but he would tell others that each kilo cost more so he could make a profit on the sale.  [*Id.* at 11:18 to 12:4.]

---

[1] According to Martinez, Homeland had the cocaine stored at a local police department.  The Government had seized that cocaine after "it was found in the ocean."  [Hr'g Tr. 10:11 to 14.]

During the meeting, Holloway called someone telling them it was "going to be $25,000 a kilogram." [*Id.* at 11:24 to 25.]

Following the meeting, Holloway and Martinez began to exchange text messages through a phone application, "Signal," which according to Martinez, drug dealers use because the application makes "it[] harder for the government to drop in on the lines." [*Id.* at 12:12 to 21.] Holloway and Martinez exchanged several messages throughout June and early July 2021. [*Id.* at 13:4 to 15; see also Gov't Ex. B.] In those messages, Holloway sent Martinez pictures of U.S. currency—that is, "the proof of life of cash." [*Id.* at 15:21 to 16:16.] Some pictures depicted Holloway's money and others showed Holloway's "boys' money[.]" [*Id.*] Martinez and Holloway also had a videocall where the agent showed Holloway the cocaine and opened a few packages so Holloway could see the drugs. [*Id.* at 14:8 to 13.] Martinez also sent Holloway pictures of the cocaine. [*Id.* at 14:14 to 15.] Martinez and Holloway eventually agreed the cocaine deal would happen on July 13, 2021 in "Southern Jersey." [*Id.* at 15:13 to 14; 16:17 to 23.] Holloway stated he would need 15 kilograms of cocaine: 5 kilos for himself, and 10 kilos for other buyers that Holloway located. [*Id.* at 15:15 to 17.] The parties agreed to meet a hotel in Mount Laurel, New Jersey (the Hotel). [*Id.* at 16:20 to 17:1.]

## B. The Hotel Drug Deal

On the prearranged date, law enforcement agents setup surveillance at the Hotel. [*Id.* at 17:1 to 7.] When the agents saw Holloway arrive at the Hotel, Martinez and another Homeland undercover agent greeted Holloway in the Hotel's lobby. [*Id.* at 17:1 to 7.] The trio then went to a room to discuss the drug deal. [*Id.* at 17:21 to 23; 102:19 to 25.] In the room, Holloway called unknown individuals on his phone. [*Id.* at 18:4 to 9.]

3

Moments later, agents spotted an individual, later identified as Lavinston Lamar, arrive at the Hotel.  [*Id.* at 18:10 to 14; 103:13 to 15.]  They also observed an individual, later identified as Burtran Marshall, arrive at the Hotel in a separate car.  [*Id.* at 103:13 to 15.]  The Undercovers and Holloway then greeted Lamar.  [*Id.* at 18:15 to 18.] They asked Lamar if he had brought his money with him.  [*Id.* at 18:19 to 19:1.]  Lamar then retrieved a black bag from Marshall's car, brought it to his own vehicle, and invited Martinez into the car to see the money.  [*Id.* at 18:19 to 19:1; 104:4 at 17.]  After seeing the money, the Undercovers, Lamar, and Holloway went to the Hotel room.  [*Id.* at 18:19 to 19:4.]  Once there, another Homeland undercover agent brought a bag to the room containing 5 kilograms of cocaine. [*Id.* at 19:9 to 17.]  Lamar then inspected "a brick of cocaine" on a desk in the room.  [*Id.* at 19:20 to 24.]

Meanwhile, agents observed an individual, later identified as Defendant Marvin Murphy, arrive at the Hotel.  [*Id.* at 105:2 to 8.]  Around this time, Holloway had received communications from an unknown individual who had arrived at the Hotel.  [*Id.* at 20:4 to 22.]  The Undercovers, Holloway, and Lamar then left the room so Lamar could retrieve the money from his car.  [*Id.* at 20:25 to 21:2.]  The group encountered Murphy in the lobby, "standing at the elevator . . . holding a bag."  [*Id.* at 21:3 to 17; 112:11 to 16.]  After Lamar retrieved his money, the Undercovers, Holloway, and Lamar went back to the Hotel to head up to the room.  [*Id.* at 21:18 to 22:2.]  Before heading to the room with Murphy, Martinez asked Holloway if Murphy was "cool"—meaning, "if he was at the hotel to conduct business."  [*Id.* at 22:2 to 17.]

Once in the room, Lamar emptied his money onto the bed.  [*Id.* at 23:18 to 22.]  Meanwhile, Murphy removed a reusable shopping bag from his duffle bag, showed it to

4

Martinez, and placed it onto the bed in a manner that its contents—U.S. currency—were visible.  [*Id.* at 26:25 to 27:10; 28:15 to 21; 29:22 to 30:17; 115:18 to 20; 120:12 to 15; *see also* Def. Ex. 20-1.]  Murphy's bag appeared to contain "a large sum of money."  [*Id.* at 83:23 to 84:2.]  Martinez then told the other Undercover to have 5 more kilograms of cocaine brought down.  [*Id.* at 30:13 to 17; 32:11 to 14; *see also* Def. Ex. 20-1.]  Holloway invited Murphy to inspect a kilogram of cocaine.  [*Id.* at 32:16 to 33:18; *see also* Def. Ex. 20-1.]  While Murphy inspected the cocaine, law enforcement officers burst into the room and arrested Holloway, Lamar, and Murphy.  [*Id.* at 35:3 to 24; *see also* Def. Ex. 20-2.]  The officers seized the men's cellphones, taking two cellphones off Murphy.  [*Id.* at 118:19 to 24; *see also* Def. Ex. E (Docket No. 53-5).]  The officers also seized the bags that Lamar and Murphy brought to the Hotel room.  [Def. Ex. E.]  The bags contained over $240,000 in U.S. currency.  [*Id.* at 122:23 to 123:2.]

## C. The Warrants and Murphy's Pending Charge

Two days after the arrests, law enforcement agents obtained a search warrant to search Holloway's car.  [Gov't Mem. of Law in Opp'n to Def.'s Omnibus Mot. 12 (Gov't Opp'n Br.) (Docket No. 51).[2]]  The agents searched his car, uncovering a black leather bag containing over $97,000.  [Def. Ex. E.]  About three weeks after arresting Murphy, law enforcement officers applied for search warrants to search eight cellphones, including the two cellphones the officers seized from Murphy.  [Def. Ex. E; *see also* Gov't Opp'n Br. at 12.]  The agents sought to search Murphy's cellphones for "[a]ll records" relating to violations of 21 U.S.C. §§ 841(a)(1) (unlawful possession with the intent to distribute and distribution of drugs), 846

---

[2] At the suppression hearing, Homeland Security Special Agent Brian Trudel testified that he reviewed the Government's opposition brief to Murphy's omnibus motion and found the timeline presented in the Government's brief on obtaining the search warrants for Murphy's cellphones to be an "accurate timeline." [Hr'g Tr. 98:8 to 12.]

(conspiracy to distribute or possess with the intent to distribute drugs), and 843(b) (unlawful use of a communication facility), and that involve Holloway, Lamar, Murphy, Marshall, and "other known and unknown co-conspirators[] since May 2021." [Def. Ex. E.]  The agents also wanted to search Murphy's cellphones for:

- Lists of customers and related identifying information;

- Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specified transactions;

- Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

- Any information recording the schedule or travel from June 21, 2021 to the present of Holloway, Lamar, Marshall, or Murphy; and

- All bank records, checks, credit card bills, account information, and other financial records.

[*Id.*]  Finally, the agents wanted to search the phones for "[e]vidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edit, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history."  [*Id.*]

In support of the search warrant applications, Homeland Security Special Agent Brian Trudel submitted an affidavit outlining his and the other agent's investigation of Holloway, Lamar, and Murphy, as well as their arrests.  Trudel observed the Hotel meeting by video while positioned in an adjacent Hotel room.  [Hr'g Tr. 99:17 to 23.]  In his affidavit, Trudel testified that agents observed Holloway using a cellphone "to communicate with potential co-conspirators while meeting with [Martinez] in California," and again at the Hotel to "communicate with what appeared to be co-conspirators who arrived at the [Hotel] to join the drug transaction."  [Def. Ex. E.]  He added the agents seized the phones the day they

6

arrested Murphy, Lamar, and Holloway, and the phones' contents "are . . . in substantially the same state as they were when [the phones] first came into the possession of [law enforcement agents]." [*Id.*] The Honorable Sharon A. King, U.S.M.J., issued the requested search warrants. [*Id.*]

A federal grand jury later indicted Murphy for conspiracy to distribute and possess with intent to distribute cocaine, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), in violation of 21 U.S.C. § 846.[3] [Docket No. 42.]

### D. The Evidentiary Hearing

After Murphy moved to suppress evidence, the Court held an evidentiary hearing where the Government presented testimony from Martinez and Trudel. [Hr'g Tr. 7, 97.] Martinez testified about his undercover work, his dealings with the Source and Holloway in California, his communications with Holloway, and his interactions with Holloway, Lamar, and Murphy at the Hotel. Trudel testified about his observations inside the Hotel room, the surveillance agents' observations outside the Hotel, and his application for various search warrants. The Court also received into evidence, among other things, video footage depicting the meeting in the Hotel room. [Def. Exs. 20-1, 20-2.]

---

[3] The grand jury originally indicted Murphy with conspiracy to distribute and possess with intent to distribute at least 5 kilograms of cocaine, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), in violation of 21 U.S.C. § 846. [Docket No. 31.] Given the Department of Justice's new guidance on charging offenses in drug cases, the Government obtained a superseding indictment under 21 U.S.C. § 841(b)(1)(C)'s penalty provision to remove the mandatory minimum penalty. [Gov'n Opp'n Br. at 5 n.3.]

## II. THE MOTION TO SUPPRESS

### A. Murphy's Arguments

Murphy challenges both his warrantless arrest and seizure of his cellphones and bag, as well as the search warrants authorizing the search of his cellphones.  [Def.'s Mem. of Law in Supp. of Omnibus Mot. 9-15 (Def.'s Br.) (Docket No. 50-1).]

Starting with his arrest and the seizure of his cellphones, Murphy argues the agents lacked probable cause to arrest him and the Government cannot justify the warrantless seizure of his cellphones.  [*Id.* at 12-13.]  Murphy argues the agents lacked probable cause because the agents "did not deal directly" with him, did not know about the contents of his conversations with Holloway, and did not observe him purchase any drugs.  [*Id.* at 14.]  Murphy posits the agents may have had reasonable suspicion that he committed a crime, but not probable cause. [*Id.*]  Because the agents lacked probable cause, the argument goes, the Government cannot rely on the search incident exception to the warrant requirement to justify the warrantless seizure of his cellphones because that exception requires law enforcement to have probable cause to arrest.  [*Id.*]

Turning to the seizure of the bag, Murphy argues the Government cannot rely on the search incident to arrest exception because:  (1) the agents lacked probable cause (for the reasons already discussed); and (2) the bag was not within his immediate control when the agents seized it.  [*Id.* at 14-15.]  In addition, Murphy argues the police had no reason to believe the bag contained a weapon, and so, law enforcement safety concerns cannot validate the seizure.  [*Id.* at 15.]  Murphy contends the agents should have secured a warrant before seizing the bag and searching it, and because they did not, the Court should suppress the bag and its contents.  [*Id.*]

Murphy also argues the Government cannot rely on the plain view doctrine or claim he abandoned the bag.  [Def.'s Reply Mem. of Law in Supp. of Omnibus Mot. 6-7 (Def.'s Reply Br.) (Docket No. 52).]  Murphy asserts he did not—by words or conduct—disclaim ownership of the bag or relinquish the property.  [*Id.* at 6.]  According to Murphy, the Government has not shown that by merely placing the bag on the bed, he abandoned it.  [*Id.* at 7-8.]  In addition, Murphy contends the plain view doctrine is inapplicable because the agents lacked probable cause to associate the bag with criminal activity.  [*Id.* at 8.]

Shifting to the search warrants, Murphy contends the warrants were overbroad and amount to an unconstitutional general warrant.  [Def.'s Br. at 9-10.]  Murphy argues the search warrants here are unconstitutional because they give law enforcement "unlimited discretion."  [*Id.* at 10.]  Murphy challenges the warrants' language authorizing searches of records "relating to" Title 21 violations.  [*Id.* at 10-11.]  According to Murphy, that language gives law enforcement unbridled discretion to search the cellphones for evidence they determine "relates to" drug offenses.  [*Id.*]

And Murphy argues the warrants are impermissibly vague and not particularized.  [*Id.* at 11-12.]  Murphy explains that "[n]one of the items listed [in the warrant are] tied to a particular offense involved in this investigation."  [*Id.* at 11.]  He goes onto explain that some items—like travel schedules, bank records, account records, and financial information— "have nothing to do with illegal drugs." [*Id.*]  Pointing to the United States District Court for the Southern District of Illinois decision in *United States v. Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015), Murphy asserts that search warrants requesting "any or all files" are not particularized to satisfy the Fourth Amendment.  [Def.'s Reply Br. at 4.]  Murphy also contends the warrants

lack any limitation to restrain law enforcement from reviewing items not within the warrants' scope.  [*Id.* at 11-12 (citing *United States v. Cawthorn*, 682 F. Supp. 3d. 449 (D. Md. 2023)).]

Onto the execution of the warrants, Murphy argues the three-week delay between the seizure of his cellphones to the issuance of the search warrant was unreasonable.  [*Id.* at 12.] Pointing to the Eleventh Circuit's decision in *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009), Murphy argues courts have found three-week delays like the one here to be unreasonable.  [*Id.*]  Murphy contends the Government's reliance on *United States v. Stabile*, 633 F.3d 219 (3d Cir. 2011) to validate the three-week delay is misplaced, because unlike here, *Stabile* involved a consent to search.  [Def.'s Reply Br. at 3.]  Murphy also asserts nothing prevented the agents from securing the warrants sooner.  [Def.'s Br. at 12.]  According to Murphy, the agents should have sought the search warrants for his phones sooner because the agents knew Murphy did not receive any drugs and knew very little about Murphy's communications with Holloway.  [*Id.*]  Thus, Murphy asks the Court to suppress the results from any search of his cellphones.  [*Id.*]

Lastly, Murphy asserts the good-faith exception to the exclusionary rule cannot save the challenged searches and seizures from suppression.  [Def.'s Reply Br. at 8-11.]  Murphy contends the good-faith exception does not apply to warrantless searches and seizures, or the law enforcement's conduct here.  [*Id.* at 8.]

### B.  The Government's Arguments

To start, the Government contends the agents had probable cause to arrest Murphy given their dealings with Holloway and Murphy's conduct at the Hotel.  [Gov't Opp'n Br. at 15-17.]  The Government points out the agents worked with Holloway to broker a cocaine deal, and notes Holloway repeatedly told the agents he had other potential buyers.  [*Id.*

at 16-17.]  And on the prearranged date, Murphy showed up to the Hotel with a bag full of U.S. currency to meet with Holloway and the Undercovers. [*Id.*]  The Government explains Murphy went to the Hotel room with the Undercovers, Lamar, and Holloway with his cash, and Murphy inspected the cocaine.  [*Id.*]  Given the agent's investigation and Murphy's conduct, the agents had probable cause to arrest him for suspected drug-trafficking.  [*Id.* at 17.] Because the agents had probable cause to arrest Murphy, the Government contends the search incident to arrest exception allowed the agents to seize the cellphones found on his person. [*Id.*]

For Murphy's bag of cash, the Government argues the agents lawfully seized it because:  (1) Murphy abandoned the bag when he placed it on the bed to consummate the drug deal; and (2) the plain view doctrine allowed the seizure.  [*Id.* at 18-20.]  The Government explains the Fourth Amendment's protections do not extend to abandoned property.  [*Id.* at 19.]  The Government contends Murphy abandoned any privacy interest in the bag when he sought to exchange the bag for the cocaine.  [*Id.*]  The Government then explains Murphy had no intention to keep the bag's contents private because he expected the Undercovers to look into the bag to see if the funds were enough for the cocaine.  [*Id.*]

The Government also contends the plain view doctrine allowed the agents to seize the bag.  [*Id.* at 19-20.]  The Government explains the agents rented the Hotel room in which Murphy brought the bag, and so, the agents were lawfully present when they saw the bag. [*Id.* at 19.]  The incriminating character of the bag was immediately apparent to the agents because when Murphy placed the bag on the bed, it slightly opened revealing its cash contents. [*Id.* at 20; see also Gov't Ex. 3 (pre-search pictures of bags).]  And because Holloway, Murphy, and the Undercovers met in the Hotel room for a drug deal, the Government

explains the agents had probable cause to associate the bag with criminal activity.  [*Id.*]  In addition, the Government contends the agents had the lawful right to access the bag because Murphy placed the bag on the bed in front of them.  [*Id.*]  Thus, the agents lawfully seized the bag.  [*Id.*]

Turning to the search warrants, the Government argues the warrants are particularized and limited the agents' discretion.  [*Id.* at 8.]  The Government asserts the warrants limited the agents' scope of the search for evidence relating to specific statutory offenses that involved Murphy and his alleged coconspirators over a two-and-a-half-month timeframe.  [*Id.*] According to the Government, courts have upheld as constitutional nearly identical search warrants.  [*Id.* (citing *United States v. DeWald*, 361 F. Supp. 3d 413 (M.D. Pa. 2019)).]

The Government also contends the search warrants are not overbroad, explaining the search warrant affidavits establish probable cause to seize all items listed in the warrant.  [*Id.* at 9.]  For example, the Government notes that Holloway traveled to California to broker the cocaine deal, and Murphy and his other alleged coconspirators all traveled to the Hotel with large amounts of U.S. currency on the prearranged date.  [*Id.*]  According to the Government, that conduct gave the agents probable cause to believe Murphy's and his coconspirator's travel schedules and financial information constituted evidence of drug trafficking (or a conspiracy). [*Id.*]  And if the Court determines the search warrants are overbroad, the Government argues the proper remedy is to strike only the portions of the warrant not supported by probable cause.  [*Id.* at 9-10 (citing *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137 (3d Cir. 2002)).]  The remaining evidence would still be admissible.  [*Id.* at 10.]

In addition, the Government asserts the agents diligently executed the warrants, and the Government routinely disclosed the results of the searches to Murphy.  [*Id.* at 10-11; *see also* Gov't Exs. 1-2 (Docket No. 51-1).]  The Government argues Murphy has not shown the agents unreasonably executed the warrants, and so, his challenge to the warrants' execution fails.  [*Id.*]

The Government also argues the three-week delay in obtaining the warrants was not unreasonable.  [*Id.* at 11-12.]  The Government explains that within the challenged three weeks, the agents drafted, applied, and obtained warrants to search Murphy's and his alleged coconspirator's cars.  [*Id.* at 12.]  Then, the agents drafted eight search warrants for the cellphones they seized.  [*Id.*]  Those search warrants required initial drafts, revisions by an Assistant United States Attorney, and approval from the United States Attorney's Office.  [*Id.*]  Once approved, the Government submitted the eight search warrant applications to the Magistrate Judge for approval.  [*Id.*]  A few days later, the Magistrate Judge issued the search warrants.  [*Id.*]  Given those circumstances, the Government argues the three-week delay was reasonable.  [*Id.*]  The Government argues Murphy cannot rely on *Mitchell* because that case is not on point, and other courts have found *Mitchell* to be an "outlier."  [*Id.* at 13-14.]  Pointing to *Stabile*, the Government notes the Third Circuit found a three-month delay not to be unreasonable.  [*Id.* at 13.]

Finally, the Government argues the good-faith exception to the exclusionary rule precludes suppression of the evidence Murphy wants suppressed.  [*Id.* at 20-21.]  The Government explains the agents who arrested Murphy, searched the bag, seized the phones, and searched the phones under the search warrants "did so in good faith reliance on

established law." [*Id.* at 21.]  The Government also contends Murphy has not shown the

agents acted in bad faith.  [*Id.*]

## III.  DISCUSSION

### A. Credibility Determinations

On a motion to suppress evidence, trial courts must determine the credibility of

witnesses, weigh the evidence, and reach "any 'inferences, deductions and conclusions to be

drawn from the evidence.'"  *United States v. Cole*, 425 F. Supp. 3d 468, 473 (W.D. Pa. 2019)

(quoting *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)); *see also United

States v. Graham*, 2014 WL 3396495, at *4 (D.N.J. July 9, 2014) (citing *Gov't of the V.I. v.

Gereau*, 502 F.2d 914, 921 (3d Cir. 1974)).  Trial courts may "accept or reject any or all of a

witness's testimony." *Graham*, 2014 WL 3396495, at *4 (quoting *United States v. Demings*, 787

F. Supp. 2d 320, 326 (D.N.J. 2011)).  In assessing a witness's credibility, courts "should

consider:  the witness's demeanor and manner on the stand; the witness's ability to accurately

recollect the matters at hand; and the extent to which the testimony withstands a

common-sense test of reason and logic." *United States v. Harris*, 2023 WL 5425395, at *4

(D.N.J. Aug. 23, 2023).

Having had the opportunity to view Martinez' and Trudel's demeanor during

questioning, the Court finds them both credible.  Both agents testified in a calm and

straight-forward manner, and provided detailed testimony.  They appeared honest when

testifying and acknowledged mistakes.  For example, Trudel acknowledged his affidavit in

support of the search warrant may have been inaccurate about the amount of money found

in Murphy's bag. [Hr'g Tr. 124:8 to 21.]  Further, the surveillance footage depicting the Hotel

room meeting aligns with their testimony.   So the Court credits Martinez' and Trudel's testimony in full.

## B. Fourth Amendment Principles

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures."   U.S. Const. amend. IV.   "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies."   *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010)).   Where, as here, the Government obtains evidence from a warrantless search or seizure, then it must show by a preponderance of the evidence that an exception to the warrant requirement applies.   *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992).   Otherwise, the exclusionary rule bars the admission of the illegally obtained evidence.   *Id.*

## C. The Arrest and Seizure of the Cellphones

Given the record here, the Court finds the agents had probable cause to arrest Murphy and lawfully seized his cellphones from his person.

The Fourth Amendment allows law enforcement officers to make a warrantless arrest so long as the officer has probable cause to believe that the suspect has, or is committing, a crime.   *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018).   "Probable cause is not a high bar . . . requir[ing] only a probability or substantial chance of criminal activity, not an actual showing of such activity."   *Id.* at 57 (citations and internal quotation marks omitted).   To determine whether an officer had probable cause to make a warrantless arrest, courts must "examine events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable

cause." *Id.* at 56-57 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)); *see also Florida v. Harris*, 568 U.S. 237, 244 (2013) ("In evaluating whether the State has met this practical and common-sensical [probable cause] standard, [courts] have consistently looked to the totality of the circumstances.").

Once a law enforcement agent makes a lawful arrest, the search incident to arrest exception allows the agent to search the "arrestee's person and the area within his immediate control"—that is, an "area from within which he might gain possession of a weapon or destructible evidence." *United States v. Shakir*, 616 F.3d 315, 317 (3d Cir. 2010) (internal quotation marks omitted) (quoting *Chimel v. Cal.*, 395 U.S. 752, 763 (1969)).

Viewing the historical facts leading up to the arrest, the Court finds the agents had probable cause to arrest Murphy for drug-trafficking.   At the time of his arrest, the Undercovers were working with Holloway to broker a multi-kilogram cocaine deal. Holloway repeatedly told Martinez he could locate buyers for the cocaine.   Holloway sent Martinez pictures of U.S. currency depicting his and "boys' money[.]"   [Hr'g Tr. 15:21 to 16:16.] On the prearranged date, the Undercovers observed Holloway using his cellphone to talk to unknown individuals.   Moments later, Murphy arrived at the Hotel with a bag full of cash.   While in the Hotel room, Murphy showed the bag's cash contents to Martinez, placed it on the bed, and then inspected a cocaine package.   Meanwhile, the Undercovers knew Lamar had brought money to the Hotel with him and had inspected the drugs.   Given the amount of cocaine discussed for the sale (15 kilograms), the agents knew the cocaine would be resold.   [Hr'g Tr. 37:6 to 13.]   Thus, based on the totality of the circumstances, the agents had probable cause to arrest Murphy for, among other things, conspiring with Holloway to traffic cocaine or his attempted purchase of a kilogram or more of cocaine.   *See United States*

16

*v. Sandeen*, 2021 WL 2460603, at *4 (D. Haw. June 16, 2021) (finding police had probable cause to arrest defendant when officers observed him arriving at prearranged meeting location to sell drugs, and overheard defendant discussing drugs' weight and appearance with buyer).

Because the agents lawfully arrested Murphy, the agents had the right to search his person and seize any evidence on him.  *Shakir*, 616 F.3d at 317.  Therefore, the agents lawfully seized Murphy's two cellphones. *United States v. Green*, 2020 WL 9459171, at *7-8 (W.D.N.Y. Apr. 13, 2020) (finding officers lawfully seized cellphones from defendant's person during a search incident to arrest where police had probable cause to arrest him for drug-trafficking), *rep. and recommendation adopted*, 2021 WL 1856949 (W.D.N.Y. May 10, 2021).

Yet, at the suppression hearing, Murphy sought to elicit testimony on what Martinez and the other agents knew about Holloway's communications with Murphy, and Holloway's "motivation." [Hr'g Tr. 66:15 to 18.]  According to Murphy, the agents pressured Holloway "to come up with the funds[,] and "implanted the pressure on Holloway to come up with co-conspirators."  [*Id.* at 45:8; 67:9 to 10.]  Murphy also asserted Martinez and the Source "implied that they were from a cartel and there was no fooling around."  [*Id.* at 46:24 to 25.] Murphy added "nobody knows what" Holloway told him to "induce him to come to [the Hotel.]"  [*Id.* at 47:10 to 12.]  And he contends the probable cause to arrest him "depend[ed] on what [he] intended when he showed up [to the Hotel] with money[,]" and the agents had "no proof he had any knowledge of any drug deals going on until he walked into that room." [*Id.* at 68:3 to 8.]  And the agents never asked Murphy any questions when he entered the Hotel room to reveal why he came there, like "What are you here for? How many kilos were you here for?  How much money did you bring?" and so on.  [*Id.* at 69:23 to 70:11.]

17

The Court repeatedly pressed Murphy on the relevance of Holloway's so-called "motivation[,]" the pressure applied on Holloway, and Murphy's knowledge to the probable cause determination.  [*Id.* at 44:21 to 46:8; 66:19 to 22.]  The Court found that some of Murphy's arguments were for trial and "might be going to [proof] beyond a reasonable doubt."  [*Id.* at 51:11 to 13; 64:11 to 14.]  The Court stressed, and the Government agreed, that Murphy was not involved or present during Martinez' talks with Holloway about the cocaine deal.  [*Id.* at 64:15 to 65:18.]  Thus, Murphy's knowledge and the pressure Holloway may have applied on him was irrelevant to resolve whether the agents had probable cause to arrest.

This is so because Murphy's state of mind at the time he arrived at the Hotel with a bag full of cash is irrelevant to the probable cause determination.  *See Garcia v. Bloomberg*, 662 F. App'x 50, 53 (2d Cir. 2016) ("[T]he state of mind of the demonstrators—whether they thought that they were participating in a sanctioned, First–Amendment–protected roadway march or whether they were intentionally or recklessly blocking traffic—is irrelevant to the question of probable cause, although it is a potential defense to the underlying criminal charge.").  The probable cause inquiry is not about "whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Wesby*, 583 U.S. at 588 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

Before Murphy stepped foot into the Hotel, Martinez had brokered a multi-kilogram cocaine deal with Holloway, the agents knew Holloway had procured other buyers, Martinez saw pictures of the other buyers' money before the meeting, and Martinez had already saw Lamar's buy money.  So when Murphy showed up to the Hotel with a bag full of cash, followed the group into the room where the drug deal was happening, showed Martinez his

18

bag full of cash and then inspected a kilogram of cocaine, the agents had plenty of reasons to believe Murphy was engaged in criminal activity.  The circumstances before the arrests here "certainly suggested criminal activity" and gave the agents probable cause to arrest.  *Id.* Contrary to Murphy's arguments, the Fourth Amendment doesn't require law enforcement officers to conduct a mini-trial to determine whether probable cause exists before making an arrest.  *Scott v. Farrell*, 2013 WL 6474488, at *3 (E.D. Pa. Dec. 2013) ("There is no constitutional or statutory requirement that before an arrest can be made the police must conduct a trial." (quoting *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 439-40 (7th Cir. 1986))); *see also Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n.8 (3d Cir. 2000) ("[Detective] was not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed.").  Indeed, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."  *Wesby*, 583 U.S. at 61.  Thus, Martinez' and the other Undercovers' failure to question Murphy in the Hotel room does not diminish the probable cause that existed to arrest him.

### D. The Seizure of the Bag of Cash

The Court finds the agents lawfully seized Murphy's bag full of cash because:  (1) Murphy abandoned any privacy interest in it by showing Martinez' its contents; and (2) the plain view doctrine allowed the seizure.

The Fourth Amendment allows warrantless searches of property "the owner has abandoned his reasonable expectation of privacy in."  *United States v. Curran*, 638 F. App'x 149, 153 (3d Cir. 2016) (quoting *United States v. Harrison,* 689 F.3d 301, 306–07 (3d Cir. 2012)).  Courts "must determine from an objective viewpoint whether property has been abandoned" by looking at the totality of the facts and circumstances.  *United States v. Fulani*, 368 F.3d 351,

354 (3d Cir. 2004); *see also Harrison*, 689 F.3d at 307.  "Proof of intent to abandon must be established by clear and unequivocal evidence."  *Crawford v. Roselli*, 639 F. App'x 807, 809 (3d Cir. 2016).  Courts have typically found abandonment when the owner disclaimed ownership or physically relinquished the property.  *Harrison*, 689 F.3d at 307.

Generally, a person loses an expectation of privacy in a bag if its contents are visible to the public.  *United States v. Fay*, 410 F.3d 589, 590 (9th Cir. 2005) (finding houseguest did not have a reasonable expectation of privacy in an open bag left "in an area readily accessible to anyone in the apartment")*; see generally United States v. Neff*, 1995 WL 428175 (7th Cir. 1995) ("No such expectation of privacy typically exists with open containers, such as open boxes, whose contents are readily ascertained.").  Indeed, "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351 (1967).

The Government here claims Murphy abandoned his bag full of cash when he placed it on the bed as payment for the cocaine.  [Gov't Opp'n Br. at 19.]   The Government asserts the bag's contents were visible to all in the room. [*Id.*; see also Gov't Ex. 3 (depicting Murphy's bag before search).]  And the Government alleges before Murphy placed the bag on the bed, he moved it toward Martinez' direction (apparently to show the agent the bag's contents). [Gov't Opp'n Br. at 19.] At the suppression hearing, Martinez repeatedly testified Murphy showed him the contents of the bag before Murphy placed it on the bed.  [*Id.* at 26:25 to 27:10; 28:15 to 21; see also Def. Ex. 20-1.]   And when Murphy placed the bag on the bed, the bag's contents were visible.  [Hr'g Tr. 9:22 to 30:17; see also Gov't Ex. 3.]   Because the Court finds Martinez credible, the Court credits his testimony that Murphy showed him the contents of the bag and the bag's contents were visible when Murphy placed it on the bed.

By revealing the contents of the bag to Martinez and the others in the Hotel room, Murphy abandoned his privacy interests in it.  *See United States v. Barrera-Martinez*, 274 F.Supp. 2d 950, 957 (N.D. Ill. 2003) (holding defendant "did not have an expectation of privacy in the contents of the duffel bag because the duffel bag was open and in plain view in the garage"); *see also United States v. Williams*, 1995 WL 339062, at *1 (4th Cir. 1995) ("Because the contents of the tote bag were identified first by McCullough, who turned them over to the police, and because the contents of the partially open bag were easily visible, Williams had no legitimate expectation of privacy that was violated by the seizure."); *United States v. Ramos*, 960 F.2d 1065, 1067 (D.C. Cir. 1992) (finding no reasonable expectation of privacy in a transparent plastic bag because the Fourth Amendment "provides protection to the owner of only a 'container that conceals its contents from plain view'" (quoting *United States v. Ross*, 456 U.S. 798, 822-23 (1982))).  That Murphy remained by the bag and that the money exchange for the cocaine had not yet occurred does not change the result.  This is because "[a]bandonment for purposes of the Fourth Amendment differs from abandonment in property law" since the inquiry turns on "the individual's reasonable expectation of privacy, not his property interest in the item."  *Fulani*, 368 F.3d at 354.

Still, Murphy claims under *Perkins*, he did not abandon his bag by merely placing it on the bed.  [Def.'s Reply Br. at 7-8 (citing *United States v. Perkins*, 2022 WL 326965 (N.D. Ill. Feb. 3, 2022).]  *Perkins* is different.  There, the court found Perkins did not abandon his backpack when he left the bag inside a store to go speak to law enforcement officers.  2022 WL 326965, at *6.  The court explained Perkins left the bag "where he could see it and where he could still exercise control over it."  *Id.*  The court also explained Perkins retained his privacy interest in the bag because he had the bag "zipped closed."  *Id.*

21

Unlike *Perkins*, Murphy showed the contents of the bag to law enforcement and the bag's contents were visible to the Undercovers and the others in the Hotel room when Murphy placed it down.   And the *Perkins* court explained had Perkins' bag been open so that its contents were visible, he would have lacked an expectation of privacy in the bag.  *Id.* ("By contrast, for instance, Perkins did not leave his bag unzipped or in an area with high foot traffic, which would undercut his expectation of privacy in a public setting.").   So because Murphy abandoned the bag, law enforcement properly seized it.

At the same time, the Court finds the plain view doctrine allowed the agents to seize the bag regardless if Murphy abandoned his privacy interests in it.  Law enforcement officers don't have to turn a blind eye to incriminating evidence in plain view.  The plain view doctrine allows officers to seize evidence in plain view without a warrant because the "owner's privacy interest in that item is lost."  *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).  To invoke the doctrine, the Government must show law enforcement officers:  (1) were at a lawful vantage point when they saw the evidence; (2) the evidence's incriminating character was immediately apparent to the officers—meaning, the officers had probable cause to associate the evidence with criminal activity without having to search the item first; and (3) had the lawful right to access the item.  *See*, *e.g.*, *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (citing *Horton v. Cal.*, 496 U.S. 128, 141 (1990)); *see also Arizona v. Hicks*, 480 U.S. 321, 326-29 (1987).

Here, the agents viewed the bag from a lawful vantage point and had the right to access it because the agents rented the Hotel room to facilitate the cocaine deal.  [Gov't Opp'n Br. at 19-20.]  The agents had license from the Hotel to be in the room.  *Cf. United States v. Ouedraogo*, 824 F. App'x 714, 722-23 (11th Cir. 2020) (finding officer lawfully present in hotel room and had the right to access evidence because "the hotel had given the officer's

22

permission to enter [defendant's] former hotel room").  Moreover, when Murphy showed the bag's contents to Martinez and revealed the cash inside, the bag's incriminating character became immediately apparent to the agents.  Again, Holloway brokered a cocaine deal with Martinez and all agreed to meet at the Hotel for the deal.  When Murphy showed the bag's contents to Martinez, the agent and the Undercovers already knew Lamar was there to buy cocaine since they had observed him inspect the cocaine and retrieve his money.  The agents also observed Murphy inspecting a cocaine package for all to see.  Given the agents' investigation and Murphy's conduct, the agents had probable cause to believe the bag contained incriminating evidence—that is, Murphy's buy money.  Accordingly, the agents lawfully seized the bag.

### E.  The Search Warrants for Murphy's Cellphones

Given Trudel's affidavits in support of the search warrants, this Court finds the warrants sufficiently particularized under the Fourth Amendment.

To be valid under the Fourth Amendment, a search warrant must:  (1) be based on probable cause; (2) supported by an affidavit; (3) particularly describe the place to be searched; and (4) particularly describe the person or things to be seized.  *See*, *e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).  The Fourth Amendment's particularity requirements protect against "general warrants"—warrants authorizing "general, exploratory rummaging in a person's belongings." *$92,422.57*, 307 F.3d at 148 (quoting *Coolidge v. N.H.*, 403 U.S. 443, 467 (1971)). A warrant is not unconstitutionally "general" unless it "vest[s] the executing officer with unbridled discretion to conduct an exploratory rummaging . . . in search of criminal evidence." *United States v. Karrer*, 460 F. App'x 157, 161 (3d Cir. 2012) (quoting *United States v. Leveto*, 540 F.3d 200, 211 (3d Cir. 2008)).  The Fourth Amendment's particularity provisions

require the warrant to "identify the specific offense for which the police have established probable cause," "describe the place to be searched," and "specify the items to be seized by their relation to designated crimes." *United States v. Perez*, 712 F. App'x 136, 138-39 (3d Cir. 2017) (quoting *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013)).

Unlike a general warrant, an overbroad warrant "describe[s] in both specific and inclusive generic terms what is to be seized, but . . . authorizes the seizure of items as to which there is no probable cause." *Karrer*, 460 F. App'x at 162 (alterations in original, internal quotation marks omitted) (quoting *$92,422.57*, 307 F.3d at 149). "Probable cause exists where the totality of the circumstances suggests 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Gates*, 462 U.S. at 238). To determine whether a warrant is overbroad, courts must "measur[e] the scope of the search and seizure authorized by the warrant against the ambit of probable cause established by the affidavit upon which the warrant issued." *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982). Courts can cure overbroad warrants by "striking from [the] warrant those severable phrases and clauses that are invalid for lack of probable cause or generality and preserving those severable phrases and clauses that satisfy the Fourth Amendment." *$92,422.57*, 307 F.3d at 149 (quoting *Christine*, 687 F.2d at 754).

In the digital era, courts have struggled with applying Fourth Amendment principles to cellphones and other electronic devices given the wealth of information a phone or computer may contain. *Perez*, 712 F. App'x at 139. Cellphones are like "minicomputers" with "immense storage capacity." *Riley v. Cal.*, 573 U.S. 373, 393 (2014). They can be used to take pictures of loved ones, catch up on the news, scroll social media, calendar appointments, and so on. They also can be used to facilitate criminal activity. Indeed,

cellphones "are tools" of the drug trade.  *United States v. Hammett*, 555 F. App'x 108, 110 (2d Cir. 2014).

Because "criminals can—and often do—hide, mislabel, or manipulate files," *see Stabile*, 633 F.3d at 237, courts have upheld search warrants against particularity challenges where the warrants "authorize broad searches of electronic data on cellphones and computers," *see United States v. Reese*, 2021 WL 4429429, at *4 (W.D. Pa. Sept. 27, 2021).  *See also United States v. Bass*, 785 F.3d 1043, 1049-50 (6th Cir. 2015) (rejecting particularity challenge to search warrant for cellphones because "officers could not have known where this information was located in the phone or in what format" and therefore, "the broad scope of the warrant was reasonable under the circumstances at that time").

Here, the search warrants are sufficiently particularized and did not give the agents unbridled discretion to search the phones for whatever evidence they wanted.  The warrants here incorporated two attachments:  Attachment A (A-5 and A-6) and Attachment B.  *See United States v. Yusuf*, 461 F.3d 374, 394 (3d Cir. 2006) (finding exhibit containing items to be seized incorporated into search warrant where exhibit was attached to warrant).  Attachment A identified the phones to be searched, and Attachment B identifies the items to be seized, the specific criminal offenses under investigation, and timeframe.  Thus, the warrants pass constitutional muster because they were limited in time, place, and scope.  *Karrer*, 460 F. App'x at 161 (rejecting argument that search "was an illegal general warrant" where "warrant identified particular devices and file types to be searched for evidence of a specific statutory offense" and "sufficiently identified a time period during which the suspected offenses occurred").  Indeed, the warrants identified Murphy's cellphones as the items to be searched, specifically identified the records and digital data to be seized, detailed the specific crimes

under investigation (drug-trafficking), and limited the search to about a three-month timeframe. *Yusuf*, 461 F.3d at 395 (finding warrants sufficiently particular where they "specified that agents were searching for evidence of several specifically enumerated federal crimes[,]" limited the search to a certain timeframe, and identified the records sought); *see also Dewald*, 361 F. Supp. 3d at 418-19 (finding search warrant did "not amount to an unconstitutional general warrant" where warrant and accompanying affidavit limited officer's discretion "to search for and seize evidence of the sexual abuse offenses as set forth in the warrant and in the accompanying affidavit").

Still, Murphy contends the warrants are impermissible because they gave the agents "unlimited discretion . . . to seize what they determine to be violations of Title 21 of the United States Code." [Def.'s Br. at 10.] But the inclusion of specific statutory offenses only limits the searching officer's discretion, not expands it. *United States v. Graham*, 2022 WL 4132488, at *4 (D.N.J. Sept. 12, 2022) (finding communications data warrant sufficiently particularized where, among other things, "warrant expressly limited the search to evidence related to the charged crimes"). Indeed, the Third Circuit has repeatedly found warrants to be particularized when there is a nexus between the evidence sought and the alleged offenses under investigation. *Yusuf*, 461 F.3d at 395; *see also United States v. Fallon*, 61 F.4th 95, 107-08 (3d Cir. 2023) (finding warrant sufficiently particular where law enforcement sought records relating to "five enumerated federal offenses, identified by statutes").

"Criminals don't advertise where they keep evidence" and warrants authorizing the search of a cellphone for "any evidence" relating to drug-trafficking are not unconstitutional general warrants. *United States v. Bishop*, 910 F.3d 335, 336-38 (7th Cir. 2018) (finding warrant sufficiently particularized where it authorized police to search cellphone for "any evidence . .

. relat[ing] to the offense of [d]ealing illegal drugs" and allowed "police to look at every file on [defendant's] phone and decide which files satisfy [that] description"); *see also United States v. Belluci*, 2023 WL 8528433, at *7 (M.D. Pa. Dec. 8, 2023) (finding search warrant for cellphone sufficiently particularized where warrant "specifies the items to be seized by their relation to the designated crime with the inclusion of the language 'specifically in relation to the crime of Possession with Intent to Deliver' at the end of the identification section" (cleaned up)).

The search warrants are also not unconstitutionally overbroad because Trudel's affidavit established probable cause to seize all items listed in the warrant.  Trudel spells out his and the other agent's drug-trafficking investigation, including Holloway's, Lamar's, and Murphy's involvement.  Trudel explained the Undercovers observed Holloway using a cellphone to communicate with others to broker a cocaine deal.  He also discussed the contents of certain messages Holloway and Martinez exchanged, covering topics ranging from drug price and quantity to proof of drugs and money.  And Trudel explained that on the prearranged date, the Undercovers saw Holloway using a cellphone while providing updates to the Undercovers on the other buyers' arrival at the Hotel.  Shortly after Holloway used his phone, Lamar and Murphy arrived at the Hotel each with cash in hand.

In his affidavit, Trudel asserted he knows how "drug traffickers conduct their business and the means and methods by which they import and distribute drugs, use cellular telephones, digital display, and calling cards to facilitate drug activity."  [Def. Ex. E.]  He also added that he is familiar with how drug traffickers "conceal, covert, transmit, and transport their drug proceeds."  [*Id.*]  And based on his training and experience, Trudel knows "drug

traffickers" commonly use multiple cellphones "to thwart law enforcement detection and compartmentalize operations." [*Id.*]

Trudel's affidavit established probable cause to believe that Holloway, Lamar, and Murphy conspired with one another to buy and traffic large amounts of cocaine.  Given Holloway's use of a cellphone, the agents had reason to believe that evidence of drug-trafficking would be found on Murphy's cellphones.  The items sought—customer lists, information on drug pricing, quantity, amount, sources of drugs, financial records—all relate to drug-trafficking.  *See United States v. Zaso*, 2023 WL 4011149, at *6 (W.D.N.Y. June 15, 2023) (finding search warrant for evidence of drug trafficking, including financial records and bank accounts, not overbroad since "there is nothing 'overbroad' about a warrant that details and breaks down categories of materials, all of which relate to drug dealing in some way"); *see also United States v. Bustamante-Conchas*, 2014 WL 12697272, at *3 (D.N.M. July 8, 2014) (finding search warrant sufficiently particularized where warrant allowed officers to search for evidence of drug-trafficking activity such as "bank statements evidencing the secreting of assets, records of drug distributions, contact between co-conspirators and other drug traffickers").  And because Holloway traveled to California to broker the cocaine deal, evidence of his, Lamar's, and Murphy's travel history and movements relate to this alleged drug-trafficking conspiracy.  *See United States v. Arce-Lopez*, 995 F. Supp. 2d 79, 84 (D.P.R. 2014) (finding search warrant in drug-trafficking investigation that authorized the seizure of "items ranging from narcotics, paraphernalia used in the narcotics trade, firearms, and financial records, to address books, travel receipts, cellphones, pagers, two-way radios and suitcases" not overbroad because sought after items were "consistent with the scope of the drug conspiracy charged"); *see also United States v. Bolling*, 2023 WL 5616188, at *7-8 (S.D.

W.Va. Aug. 30, 2023) (finding search warrant for cellphone sufficiently particularized and not overbroad where warrant authorized law enforcement to seize, among other things, "map data, calendars, and ledgers" for evidence relating to drug-trafficking).   Thus, the search warrants for Murphy's cellphones are not overbroad.  *United States v. Moody*, 2021 WL 202698, at *9 (W.D.N.Y. Jan. 19, 2021) (ruling warrant that "authorized the search for and seizure of specified evidence relevant to drug trafficking, such as, narcotics, drug records, photographs and video tapes depicting individuals involved in narcotics violations, and bank records" was "precisely the type of warrant that courts routinely uphold against overbreadth challenges"), *rep. and recommendation adopted*, 2021 WL 1054372 (W.D.N.Y. Mar. 19, 2021).

But Murphy presses on, arguing the search warrants are impermissible under *Winn* because they request "all records" relating to drug-trafficking.  [Def.'s Reply Br. at 4.]  They are not.  In *Winn*, a case not binding on this Court, the police seized the suspect's cellphone after he was caught taking pictures and videos of teenage girls wearing swimsuits at a public pool while "rubbing his genitals on the exterior of his swim trunks."   *United States v. Winn*, 79 F. Supp. 3d 904, 909-10 (S.D. Ill. 2015).  The police obtained a search warrant to search the phone for "any or all files" for evidence of the statutory offense of public indecency, which included, among other things, the phone's calendar, ringtones, audio files, call logs, messages, internet history, and usage.  *Id.* at 911, 918. The *Winn* court found the warrant too overbroad and invalidated it, because "the police did not have probable cause to believe that *everything* on the phone was evidence of the crime of public indecency."  *Id.* at 919 (emphasis in original).  At best, the court found the search warrant affidavit established probable cause to only seize pictures or videos.  *Id.*  In addition, the court found the warrant invalid because it lacked any relevant timeframe.  *Id.* at 921.  The court explained the alleged crime happened

29

on one day, but the warrant placed no time limitations on the types of data or information law enforcement could seize. *Id.*

Unlike *Winn*, the search warrants here place a three-month time limitation on the information the agents could seize. And drug-trafficking and public indecency are very different crimes because evidence of drug-trafficking takes many forms. *United States v. Eggerson*, 2018 WL 6520648, at *3 (D. Minn. Sept. 27, 2018) (rejecting particularity challenge to search warrant of cellphone, and finding *Winn* unpersuasive because "evidence of drug dealing such as drugs, scales, texts, calls, ledgers, emails, photos, videos, cash, firearms, financial records, location information and proof of weapons etc., can be found in many more places and forms than evidence of public indecency"). In addition, *Winn* diverges from Third Circuit case law allowing broad searches of cellphones, computers, and other electronic devices depending on the investigation. *Stabile*, 633 F.3d at 237; *see also Reese*, 2021 WL 4429429, at *4-5. This is so because "the breadth of items to be searched depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time the warrant application is given to the magistrate." *Yusuf*, 461 F.3d at 395. Thus, *Winn* is no help to Murphy.

### F.  The Three-Week Delay in Obtaining the Search Warrants

The three-week delay to obtain the search warrants to search Murphy's cellphones was not unreasonable under the Fourth Amendment.

A lawful seizure can become unreasonable "if its manner of execution unreasonably infringes" on Fourth Amendment-protected "possessory interests." *Stabile*, 633 F.3d at 235 (quoting *United States v. Jacobsen*, 466 U.S. 109, 125 (1984)). To determine whether a lawful seizure becomes unreasonable, and thus unconstitutional, courts "must balance the nature

and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983).  In doing so, courts must consider if "the police diligently pursue[d] their investigation."  *Id.* at 709.

Starting with the Government's interest in Murphy's cellphones, the Court finds the Government has a strong one because:  (1) the phones themselves have independent evidentiary value; and (2) the agents had probable cause to believe the phones' contents contain evidence of criminal activity.  The cellphones have independent evidentiary value because having multiple cellphones is evidence of drug-trafficking. *United States v. Wright*, 534 F. Supp. 3d 416, 425 (M.D. Pa. 2021) (finding that the Government had strong interest in seizure "because multiple cell phones were found on Defendant's person and the existence of multiple cell phones was evidence of drug-trafficking"); *see also United States v. Carey*, 2020 WL 59607, at *2 (M.D. Pa. Jan. 6, 2020) (finding that the Government had strong interest in seized cellphones because police seized phones based on probable cause after phones fell from defendants' person while fleeing from police and officers found phones alongside "drugs packaged for distribution").

Setting aside the cellphones' independent evidentiary value, the agents had probable cause to believe the phones' contents contain evidence of drug-trafficking.  Indeed, on the date of his arrest, the agents observed Holloway using his cellphone to call unknown individuals.  Moments later, Murphy arrived at the Hotel with a bag full of cash and began to inspect a cocaine package.  Because the purpose of the Hotel's meeting was to buy cocaine, and since Holloway used his cellphone to coordinate his alleged coconspirator's arrival at the Hotel, there is a fair probability that evidence of drug-trafficking will be found on the

31

cellphones.  *See United States v. Karma*, 2023 WL 8357946, at *4 (E.D. Va. Dec. 1, 2023) (finding that the Government had a "strong interest" in defendant's cellphone where officers discovered the phone inside a jacket along with cash and fentanyl pills); *see also United States v. Schaffer*, 2017 WL 729787, at *4 (D.N.J. Feb. 24, 2017) (ruling "the Government had a strong interest in holding the electronic devices until they could conduct a proper forensic evaluation of [devices]" because the Government "had probable cause to believe that evidence of child pornography would be found on the seized items").

Turning to Murphy's interest in the cellphones, this Court finds his interests diminished.

First, "[a]n individual has a diminished interest in his seized property where law enforcement has probable cause to believe that the property contains evidence of criminal activity." *United States v. Adams*, 2021 WL 10265208, at *13 (W.D.N.Y. Aug. 16, 2021) (citing *United States v. Smith*, 967 F.3d 198, 208 (2d Cir. 2020)); *see also Thomas v. United States*, 775 F. App'x 477, 490 (11th Cir. 2019) (ruling defendant's possessory interest in computer was "somewhat diminished" because police "had very strong reasons to believe that a search of the computer would reveal child pornography").   The agents had probable cause to believe Murphy's cellphones are either evidence of criminal activity, or contain such evidence.  *See United States v. Green*, 2021 WL 1877236, at *6 (W.D.N.Y. Feb. 3, 2021) (finding defendant had diminished interest in cellphones because law enforcement had probable cause to believe defendant "was involved in drug trafficking and that he was using the cell phones in furtherance of his criminal activities" since defendant used cellphone to facilitate drug sales with undercover officer and individual who later overdosed), *rep. and recommendation adopted*, 2021 WL 1856949 (W.D.N.Y. May 10, 2021).

Second, Murphy never asked for his cellphones back.  *Stabile,* 633 F.3d at 235-236 (finding defendant's failure to seek return of computer "undermine[d]" his argument that the three-month delay adversely affected his Fourth Amendment rights); *see also Thomas*, 775 F. App'x at 492 (finding defendant's possessory interest in computer "diminished by his failure to request access to or the return of the computer after it was seized"); *Schaffer*, 2017 WL 729787, at *3 (finding defendant's possessory interest in seized electronic devices "minimal" where, among other things, defendant never asked about return of devices).  Indeed, law enforcement agents seized Murphy's cellphones over two years ago, and he never sought their return.  His failure to seek the cellphones return further diminishes his possessory interest in the phones, and undercuts his argument that the three-week delay in obtaining the search warrants prejudiced his Fourth Amendment possessory rights.  *See Wright*, 534 F. Supp. 3d at 427 (finding defendant's possessory interest in seized cellphones "negligible" where, among other things, defendant never moved under Federal Rule of Criminal Procedure 41(g) for phones return).

Lastly, given the record, the Court finds the law enforcement agents acted diligently to obtain the search warrants.  *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012) ("When police act with diligence, courts can have greater confidence that the police interest is legitimate and that the intrusion is no greater than reasonably necessary." (quoting *Illinois v. McArthur*, 531 U.S. 326, 331 (2001))).  Indeed, within days after Murphy's arrest, the agents applied for, and obtained, search warrants to search Holloway's, Murphy's, and Lamar's cars. [Gov't Opp'n Br. at 12.]  Then, the agents drafted eight search warrants to search the cellphones they seized.  [*Id.*]  The warrant applications for Murphy's cellphones are each over 15 pages, and details the agents' investigation and Murphy's participation in the cocaine deal.

33

[Def. Ex. E.]   In addition, many law enforcement officials had to sign off on the warrants before the agents could present the warrants for a magistrate judge for review.   [Gov't Opp'n Br. at 12.]   In the three-weeks from Murphy's arrest to obtaining the search warrants, the agents worked diligently to pursue all investigative avenues in this drug-trafficking investigation that spanned across the country.   *See United States v. Sykes*, 65 F.4th 867, 878-79 (6th Cir. 2023) (finding investigator worked diligently where, among other things, investigator applied for and executed multiple search warrants, interviewed witnesses, reviewed results from multiple search warrants, and assisted on different investigation).

And courts have found delays longer than three-weeks not unreasonable.   *Thomas*, 775 F. App'x at 492 (finding 33-day delay not unreasonable); *United States v. Laist*, 702 F.3d 608, 617 (11th Cir. 2012) (finding 25-day delay not unreasonable); *Wright*, 534 F. Supp. 3d at 428 (finding 13-month delay not unreasonable); *United States v. Carey*, 2020 WL 59607, at *3 (M.D. Pa. Jan. 6, 2020) (ruling 21-day delay "not so unreasonable" to violate defendant's Fourth Amendment rights); *United States v. Cook*, 2021 WL 1534980, at *11 (M.D. Pa. April 19, 2021) (ruling 51-day delay not unreasonable).

*Mitchell* doesn't provide a lifeline to Murphy's challenge to the three-week delay.   True, the Eleventh Circuit, on very different facts, found a 21-day delay to obtain a search warrant unreasonable.   565 F.3d at 1352.   There, the investigator seized a computer hard drive suspecting it contained child pornography.   *Id.* at 1349.   Instead of immediately applying for a search warrant, the investigator attended a two-week out-of-state training.   *Id.*   Three days after the investigator returned, he applied for a search warrant to search the hard drive.   *Id.* The search warrant affidavit largely consisted of boilerplate language, containing only a few paragraphs of content relevant to the investigation.   *Id.* at 1349-50.   The investigator's only

explanation for the 21-day delay to obtain the warrant was he "didn't see any urgency of the fact that there needed to be a search warrant during the two weeks that [he] was gone, and that he felt there was no need to get a search warrant for the content of the hard drive until [he] returned back from training." *Id.* at 1351 (internal quotation marks omitted, alterations in original).

On those facts, the Eleventh Circuit found the 21-day delay unreasonable. *Id.* at 1352. The *Mitchell* court found law enforcement made "[n]o effort . . . to obtain a warrant within a reasonable time because law enforcement officers simply believed that there was no rush." *Id.* at 1353. The court explained the investigator could have obtained the warrant within the two-and-a-half days before the investigator left for training, another investigator could have obtained the warrant in the main investigator's absence, and the search warrant application could have been put together sooner, especially because the search warrant affidavit contained largely boilerplate language. *Id.* at 1351.

But the *Mitchell* court explained the "reasonableness of the delay is determined 'in light of all the facts and circumstances,' and 'on a case-by-case basis.'" *Id.* at 1351 (quoting *United States v. Mayomi*, 873 F.2d 1049, 1054 n.6 (7th Cir. 1989)). There is no "per se rule of unreasonableness" because "the devil, as always, is in the details." *Laist*, 702 F.3d at 616 (internal quotation marks omitted) (quoting *McArthur*, 531 U.S. at 331). Following *Mitchell*, the Eleventh Circuit found delays longer than 21-days reasonable given the circumstances. *Id.* at 617; *see also Thomas*, 775 F. App'x at 492. Other circuits have too. *Sykes*, 65 F.4th at 878-79.

On balance then, the Government's strong interest in Murphy's cellphones outweighs his diminished possessory interest in them. Since the agents acted diligently to secure the

warrants, the Court finds the three-week delay not unreasonable.  *Wright*, 534 F. Supp. 3d at 427 (finding 13-month delay reasonable where cellphones were "not obtained through an unlawful search, Defendant did not move for the return of the property, there is no evidence of dilatory tactics, and the time lapse was the result of normal investigative and judicial processes").

### G. Good-Faith Exception to the Exclusionary Rule

Finally, this Court finds the good-faith exception to the exclusionary rule bars suppression.

The exclusionary rule is "a judicially created remedy" aimed "to deter future Fourth Amendment violations."  *Davis v. United States*, 564 U.S. 229, 236-38 (2011).  Courts do not always invoke the exclusionary rule whenever law enforcement obtain evidence in violation of the Fourth Amendment because there are exceptions to the rule.  *United States v. Goldstein*, 914 F.3d 200, 203 (3d Cir. 2019).  Suppression is "the last resort" and appropriate only where the deterrent value of suppression outweighs its costs—that is, "omitting reliable, trustworthy evidence of a defendant's guilt."  *United States v. Katzin*, 769 F.3d 163, 171 (3d Cir. 2014) (internal citation and quotation marks omitted)

The good-faith exception prohibits suppression of evidence "when the executing officers acted in 'good faith' or 'objectively reasonable reliance' on a 'subsequently invalidated search warrant.'"  *United States v. Henry*, 2023 WL 2770817, at *2 (3d Cir. Apr. 4, 2023) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)), *cert. denied*, 144 S. Ct. 208 (2023). The good-faith exception also applies when law enforcement reasonably rely on "a then-valid statute, and then-binding appellate authority[.]"  *United States v. Scarfo*, 41 F.4th 136, 167 (3d Cir. 2022) (internal citation and quotation marks omitted, alteration in original).  Generally,

36

"[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good-faith exception." *United States v. Hodge*, 246 F.3d 301, 307-08 (3d Cir. 2001).  A warrant's existence "will obviate the need for any deep inquiry into [the] reasonableness of the officer's reliance on the warrant." *United States v. Caesar*, 2 F.4th 160, 170 (3d Cir. 2021) (internal quotation marks omitted) (quoting *United States v. Stearn*, 597 F.3d 540, 561 (3d Cir. 2010)).

But the good-faith exception has its limits.  Indeed, "[i]n rare circumstances, . . . a warrant may be so flawed that 'the officer will have no reasonable grounds for believing that [it] was properly issued.'" *Id.* (second alteration in original) (quoting *Leon*, 468 U.S. at 923).  Thus, the good-faith exception will not apply when:

- the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

- the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;

- the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

- the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Id.* (quoting *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010)).

Murphy identifies no grounds for this Court to find the good-faith exception inapplicable to the search warrants.  Indeed, he has not challenged the probable cause supporting the warrants.   In fact, he has challenged no information contained in the search warrant affidavits.[4]

---

[4] At the suppression hearing, Murphy elicited some testimony about factual inaccuracies in the search warrant affidavits, like the amount of money found in Murphy's bag.  [Hr'g Tr. 124:8 to 21.]  However, Murphy makes no argument that Trudel's affidavit contained deliberate or reckless falsehoods.

In any event, because a neutral and detached magistrate judge issued the search warrants after finding probable cause, the agent's reliance on the warrants was objectively reasonable. *Hodge*, 246 F.3d at 307-08; *see also Graham*, 2022 WL 4132488, at *5. To the extent Murphy argues the good-faith exception is inapplicable because the warrants were "so facially deficient," *see Caesar*, 2 F.4th at 170, Third Circuit courts have invoked the good-faith exception to bar suppression of evidence obtained from overly broad and not particularized warrants, *see Fallon*, 61 F.4th at 108 (ruling good-faith exception prohibited suppression even if warrant was not particularized). *See also United States v. Taylor*, 855 F. App'x 839, 841 (3d Cir. 2021) (finding good-faith exception applies even though warrant might have been overbroad because agent obtained the warrant and executed it in good faith); *Tracey*, 597 F.3d at 154-55 (ruling good-faith exception barred suppression of evidence obtained from overly broad warrant); *Graham*, 2022 WL 4132488, at *5 (finding suppression inappropriate under good-faith exception, and explaining even if warrant "was not sufficiently particularized," that "does not mean that the officer could not have relied upon it in good faith" (quoting *United States v. Walker*, 2015 WL 3485647, at *5 (D. Del. May 29, 2015), *aff'd,* 677 F. App'x 53 (3d Cir. 2017))). So the Court denies Murphy's challenges to the search warrants.

## IV. MURPHY'S DISCOVERY REQUESTS

Beside his suppression requests, Murphy also moves to compel the Government to produce various discovery and to hold the Government to its *Brady*, *Giglio*, and Jencks obligations. [Def.'s Br. at 16-24.] The Government argues many of Murphy's requests are moot because the Government either has provided, or will provide the requested information before trial. [Gov't Opp'n Br. at 22-26.] At the suppression hearing, Murphy acknowledged the Government represented it will provide discovery before trial, and he was "satisfied" with

that representation.  [Hr'g Tr. 95:3 to 8.]  Therefore, the Court will deny the remaining aspects of Murphy's omnibus motion as moot.  If the Government does not provide the requested discovery, Murphy may seek such discovery from the Court.

## V. CONCLUSION

For the above reasons, the Court **DENIES** those aspects of Murphy's omnibus motion seeking to suppress evidence, and **DENIES WITHOUT PREJUDICE** the remaining aspects of the motion seeking discovery (Docket No. 50).

An accompanying Order of today's date shall issue.

<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge

Dated: July 17, 2024